UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ROBERT ALLEN CORNISH                          CIVIL ACTION

VERSUS

CAROLYN W. COLVIN, ACTING                    NO.: 13-0002-BAJ-RLB
COMMISSIONER OF SOCIAL SECURITY

RULING AND ORDER

Plaintiff, Robert Allen Cornish ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") pursuant to 42 U.S.C. § 405(g) denying Plaintiff's application for supplemental social security income (SSI) "under Title XVI of the Social Security Act" (Tr. 111).[1]  For the reasons assigned below, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** Plaintiff's appeal **with prejudice**.

I.    PROCEDURAL HISTORY

On June 24, 2010, Plaintiff protectively filed an application for supplemental security income benefits (Tr. 18, 53, 111-18) alleging disability as of January 1, 2010 (Tr. 18, 54) "because of severe visual problems, back problems and [being] a slow learner." (Tr. 63).  Plaintiff's application was initially denied (Tr. 53) on October 13, 2010 because the Commissioner found Plaintiff's non-severe impairments — "Spine

---

[1] References to documents filed in this case are designated by "(R. Doc. [docket entry number(s)] at [page number(s)])".   Reference to the record of administrative proceedings filed in this case is designated by "(Tr. [page number(s)])".

Disorders" and "Slow Learner" — (Tr. 58) were neither alone nor in combination disabling (Tr. 58-59).   Plaintiff then filed a timely request for a hearing (Tr. 94) before an Administrative Law Judge (ALJ) on December 13, 2013 (Tr. 18).   The hearing took place on August 23, 2011 (Tr. 30-52).   Plaintiff, represented by counsel (Tr. 18, 32), appeared and testified (Tr. 32, 36-48).   Karen Harrison, a vocational expert, also testified at the hearing. (Tr. 48-50).

The ALJ rendered an unfavorable decision (Tr. 18-26) on September 12, 2011 (Tr. 15-17), finding Plaintiff had "not been under a disability . . . since June 24, 2010, the date the application was filed" (Tr. 18, 26).   Plaintiff's request for review (Tr. 12, 14) was denied by the Appeals Council on November 9, 2012. (Tr. 1-5).   The ALJ's decision rested as the final decision when the Appeals Council denied Plaintiff's request for review.   *See* 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you . . . file an action in Federal district court . . . .").   The ALJ's final decision is now ripe for review under 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "'more than a mere scintilla. It means

2

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" in the context of the National Labor Relations Act, 29 U.S.C. § 160(e)).   The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quotations omitted). Conflicts in the evidence are for the Commissioner "and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision. *See, e.g.*, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994) ("This is so because substantial evidence is less than a preponderance but more than a scintilla."); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) ("we must carefully scrutinize the record to determine if, in fact, such evidence is present; at the same time, however, we may neither reweigh the evidence in the record nor substitute our judgment for the Secretary's"); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (same).

　　If the Commissioner's decision is supported by substantial evidence, then it is conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000).  If the Commissioner fails to apply the correct legal standards, or fails to

provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

## III.   ALJ'S DETERMINATION

The Commissioner, through the ALJ, works through a five-step sequential evaluation process to determine disability. *See* 20 C.F.R. § 404.1520(a)(4).   The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability.   If the claimant is successful in sustaining his or her burden at each of the first four steps, the burden shifts to the Commissioner at step five. *See Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (explaining the five-step process).   First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).   Second, the claimant must prove his or her impairment is "severe" in that it "significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c).   At step three the ALJ must conclude the claimant is disabled if he proves that his or her impairments meet or are medically equivalent to one of the impairments contained in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(d) (step three of sequential process); 20 C.F.R. pt. 404, subpt. P, app'x 1 (Listing of Impairments).   Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his or her past relevant work. 20 C.F.R. § 404.1520(f).

If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional

capacity, age, education and past work experience, that he or she is capable of performing other work. 20 C.F.R § 404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, the ALJ initially found Plaintiff had "not engaged in substantial gainful activity since June 24, 2010, the application date." (Tr. 20). At step 2, Plaintiff had "the following severe impairments: Borderline Intellectual Functioning and Seizure Disorder." (Tr. 20). "In accordance with *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007)," the ALJ determined Plaintiff did not meet a Listing at step 3. (Tr. 20). Specifically, the ALJ considered Listings 12.05B (Intellectual Disability), 12.05C (Intellectual Disability), 12.02 (Organic Mental Disorders), 11.02 (Epilepsy – Convulsive Epilepsy) and 11.03 (Epilepsy – Non-convulsive Epilepsy). (Tr. 20-22). Between steps 3 and 4, the ALJ gave "careful consideration" to "the entire record" and found Plaintiff maintained the residual functional capacity to perform medium work, except he (1) "cannot work around dangerous moving machinery and unprotected heights," (2) "should avoid concentrated exposure to temperature extremes," (3) "cannot climb ladders, robes [sic] or scaffolds," and (4) "is limited to engaging in work that is simple, repetitive, routine and supervised." (Tr. 22-25).

Considering the RFC, the ALJ held Plaintiff could not perform his past relevant work as either a lumber yard stacker or a driver. (Tr. 25). At the fifth step, the ALJ employed the Medical Vocational Guidelines. She considered Plaintiff's age of 27 and determined he was a younger individual. (Tr. 25). Plaintiff had a high

school education and could communicate in English. (Tr. 25). Based on the Medical Vocational Guidelines, the transferability of job skills was "not material" to the ultimate determination. (Tr. 25). Considering these factors, along with the vocational expert's testimony, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the claimant can perform" — janitorial positions, lobby cleaner/indoors and laundry worker. (Tr. 25-26). Ultimately, the ALJ found Plaintiff had "not been under a disability . . . since June 24, 2010, the date the application was filed." (Tr. 26).

## IV.    ASSIGNMENTS OF ERROR

Plaintiff claims several parts of the decision are legally deficient and/or not supported by substantial evidence. First, Plaintiff suggests the rejection of valid IQ scores in the mild mental retardation range — which, if accepted, would have allowed him to meet Listing 12.05C — was not supported by substantial evidence and was contrary to relevant legal standards. (R. Doc. 13 at 10-21). Alternatively, the ALJ legally erred by not considering whether Plaintiff "medically equals Listing 12.05C with an IQ in the borderline range, as the ALJ found." (R. Doc. 13 at 21-22). Finally, Plaintiff seeks remand because the RFC does not (a) specify the degree of job supervision; (b) include certain limitations accepted by the ALJ; or (c) include other limitations opined by Drs. Brian G. Murphy and Lester Clayton Culver. (R. Doc. 13 at 22-25).

The Commissioner responds that the ALJ properly rejected Plaintiff's IQ scores indicating mild mental retardation because the record "shows clear and

unambiguous evidence of intentional misrepresentations" — i.e., malingering — by Plaintiff during repeated testing." (R. Doc. 15 at 5-10). Moreover, the ALJ appropriately considered the entire record when rejecting Dr. Culver's opinion of mild mental retardation. (R. Doc. 15 at 8). The ALJ did not have to obtain an expert opinion as to whether he medically equaled Listing 12.05C with a borderline IQ. (R. Doc. 15 at 10-11). In this case, "no determination regarding medical equivalence was possible before the State agency" because "there was no valid evidence to analyze due to Plaintiff's lack of cooperation during consultative examinations." (R. Doc. 15 at 10). Finally, the ALJ's RFC and ultimate disability finding are supported by substantial evidence because the ALJ appropriately incorporated Plaintiff's limitations into her hypotheticals to the vocational expert and later into the RFC. (R. Doc. 15 at 12-14).

## V.   DISCUSSION

### A.   Plaintiff Does Not Meet Listing 12.05C

To meet or medically equal Listing 12.05C, a claimant must show: (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22;" (2) "[a] valid verbal, performance, or full scale IQ of 60 through 70;" and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app'x 1 § 12.05C. According to Plaintiff, he "undisputed[ly]" meets the first two requirements. Therefore, the "only issue is

whether Cornish had 'A valid verbal, performance, or full scale IQ of 60 through 70,'" as assessed by Dr. Lester Culver. (R. Doc. 13 at 11-21).

Plaintiff explains that he satisfies the first requirement of Listing 12.05C because "the ALJ found Cornish had IQ scores in the mildly mentally retarded range as a child and he was previously paid disability benefits as a child for mental retardation." (R. Doc. 13 at 12) (citing (Tr. 21, 24)).[2]  However, this only supports onset before age 22 and not current deficits in adaptive functioning. *See Randall v. Astrue*, 570 F.3d 651, 661 (5th Cir. 2009) (introductory paragraph of Listing 12.05 requires current deficits in intellectual and adaptive function, as well as deficits in adaptive functioning manifested before age 22).  Plaintiff feels the second requirement is met as "the ALJ found that Plaintiff had the additional severe impairment of Seizure Disorder." (R. Doc. 13 at 12) (citing (Tr. 20)).  Contrary to Plaintiff's argument, the decision indicates the ALJ not only rejected Plaintiff's IQ scores between 60 and 70, but also did not find he had deficits in intellectual and adaptive functioning consistent with the requirements of Listing 12.05C.

The ALJ began her step 3 analysis by explaining that she considered whether Plaintiff's impairments "singularly or in combination meet or medically equal the required criteria for" Listing 12.05C. (Tr. 20).  After thoroughly discussing the record evidence, the ALJ gave 5 specific reasons for finding Plaintiff's "level of intellectual functioning" was "greater than the mild mentally retarded range" and he did not meet Listing 12.05C: (1) Plaintiff malingered on his first 3 (out of 4) IQ

---

[2]While he could not remember the timeframe of his childhood benefits during the hearing (Tr. 46), Plaintiff indicated in his Function Report (Tr. 162-69) that he received benefits "from 1988 — until I was 16 years old" (Tr. 167).

tests and those examiners all felt his IQ was borderline if not higher; (2) Plaintiff had past relevant work; (3) he has a valid driver's license; (4) when interviewed by an SSA representative Plaintiff did not exhibit any difficulties in reading and writing, contrary to his current allegations; and (5) while Dr. Culver diagnosed mild mental retardation, he appears to have been unaware of the results and reports from Plaintiff's three previous examinations and Culver was unable to interpret Plaintiff's full scale IQ. (Tr. 22).

Considering the ALJ's first and fifth reasons, Plaintiff contends that he "may have malingered on the first three IQ tests," but this "does not establish that he malingered on the fourth IQ test." (R. Doc. 13 at 14). According to Plaintiff, the "results of prior invalid testing cannot reasonably be accepted as rendering invalid future results" obtained by Dr. Culver. (R. Doc. 13 at 15). The reliability of Culver's opinion, in Plaintiff's view, should not decrease because Culver did not review his prior exams. Plaintiff further suggests the ALJ substituted her own "lay opinion" for Dr. Culver's when questioning Culver's results for not interpreting Plaintiff's full scale IQ. (R. Doc. 13 at 17).

Plaintiff underwent 3 IQ tests before Culver's 2011 evaluation. The first was performed by Dr. Brian Murphy in 2005 (Tr. 199-205) and the last two by Dr. Sarah Durbin in 2009 (Tr. 212-14) and 2010 (Tr. 231-33). Plaintiff malingered on each occasion. (Tr. 199, 213, 232). After that, the SSA psychologist reviewing Plaintiff's records suggested the Administration's "continued use of CEs" was "useless" because of the "pattern of validated malingering on CEs in 2005, 2009 and 2010."

(Tr. 235).  Plaintiff's counsel then arranged for a consultative examination with Dr. Lester Culver on August 12, 2011. (R. Doc. 13 at 6); (Tr. 34, 243-47).  Dr. Culver administered Plaintiff's fourth and most recent intellectual evaluation.  Culver's administration of the WAIS-IV resulted in a verbal comprehension score of 66, a perceptual reasoning score of 73, a working memory score of 58 and a processing speed score of 59. (Tr. 246).  Because there was "a scatter among the subtests," Plaintiff's "Full Scale IQ [was] not interpretable." (Tr. 246).  Based on the WAIS-IV test and his clinical interview of Plaintiff, Culver diagnosed mild mental retardation. (Tr. 247).  The verbal comprehension IQ of 66 is what Plaintiff now claims is valid and entitles him to benefits under Listing 12.05C.

In 2005, Dr. Murphy administered the WAIS exam to Plaintiff, which yielded scores in the forties. (Tr. 200).  However, Murphy explained the results were invalid due to Plaintiff's behavior during examination. (Tr. 200, 203).  Plaintiff told Murphy that he could not read or spell (Tr. 201); write his own name — even if the letters were called out to him (Tr. 199); count, make change or understand why we have money (Tr. 200); and identify basic colors, coins or common objects (Tr. 201).

Dr. Murphy believed Plaintiff was "obviously dishonest" and had a "not so hidden agenda" based on his "obvious mistakes" and "disingenuous and absurd answers" to test questions. (Tr. 199, 200, 201, 203).  Murphy's suspicions are corroborated by the record, which documents inconsistencies between the actual level of Plaintiff's abilities and his statements to Dr. Murphy.  Plaintiff testified at the hearing that he could make change (Tr. 39) and his wife previously stated he

could pay bills and count change. (Tr. 148).  Plaintiff's sister also told Dr. Murphy that he could only feed himself "sometimes" (Tr. 202), which contradicts his statement to the Administration that he can feed himself without assistance (Tr. 163).

Murphy ultimately felt Plaintiff would "be able to understand and remember and carry out instructions at a higher level that he would purport here today" and assumed Plaintiff "is best diagnosed as a slow learner." (Tr. 202-03).  Murphy found Plaintiff's IQ scores were invalid and opined Plaintiff was "of at least a borderline if not higher intellectual competency." (Tr. 203).

Like Murphy, Dr. Sarah Durbin — who examined Plaintiff on two separate occasions — also found him not credible.  In 2009, Dr. Durbin explained that Plaintiff's "cognitive skills could not be properly assessed because of malingering." (Tr. 213).  During evaluation, Plaintiff claimed he could not read (Tr. 213), "would not repeat more than three digits" when asked and said the "shape of a basketball is 'a octagon'" (Tr. 214).  Plaintiff "regular[ly]" responded to questions by simply claiming: "'I'm not familiar with that.'" (Tr. 214).  Durbin found his "intellectual functioning is no lower than borderline" (Tr. 213), despite the WAIS-III resulting in "IQ's below 45" (Tr. 214).  Durbin found that Plaintiff "deliberately misrepresented cognitive skills." (Tr. 214).

According to Durbin, Plaintiff's ability to "understand, remember and carry out simply instructions and familiar detailed instructions in adequate" and his ability to maintain attention on simple repetitive tasks for two hour blocks of time

is "good." (Tr. 214).  His ability to sustain effort and persist at a normal pace over the course of a forty-hour workweek is adequate. (Tr. 214).  Because of malingering, Durbin diagnosed a "Possible Learning Disorder, NOS" (Not Otherwise Specified) and clarified "[t]here is no evidence of a mental disorder which precludes work within his educational capacity." (Tr. 214).

In 2010, Durbin again examined Plaintiff and administered the WAIS exam. (Tr. 231-33).  After the second exam, Plaintiff's IQ scores ranged between 53 and 63. (Tr. 232).  But again, the "evaluation results [were] invalid" and "inconsistent with his presentation, adaptive functioning, life style and work history." (Tr. 232). Durbin reported that Plaintiff "often" responded to test questions by "laugh[ing]" and saying: "'Now that's something I couldn't tell you.'" (Tr. 232).  Durbin's 2010 Axis II diagnosis was "Rule out Learning Disorder." (Tr. 233).   Durbin also concluded Plaintiff's "ability to understand, remember and carry out simple instructions and familiar detailed instructions is good" and his "ability to sustain effort and persist at a normal pace over the course of a forty hour workweek is not impaired by a mental disorder." (Tr. 233).

Beyond these three psychologists, medical doctor, Catherine Cotterman, examined Plaintiff and reported he "did not appear to be mentally handicapped or [have] any kind of learning disability whatsoever" and "seemed to be of normal intellect." (Tr. 207).  In addition, Plaintiff told Dr. Cotterman that he "cannot drive a car" and "cannot perform any household chores" (Tr. 208), which is wholly

contradicted by the record. (Tr. 37, 39, 148, 207, 212, 232, 243) (drives frequently and maintains a valid license); (Tr. 41, 163, 213, 245) (performs household chores).

Plaintiff's presentation during, and the results of, Dr. Culver's examination are inconsistent with the observations and findings of Drs. Murphy and Durbin. (Tr. 243-47). To begin, Plaintiff told Culver that he "cannot read well" but that "he knows the letters of the alphabet." (Tr. 243). Culver reports that Plaintiff could read shorter words on the consent form and signed his name on the form — it appears this was done without assistance. (Tr. 243). By contrast, Plaintiff told Dr. Murphy he could not read anything or write his name, even if the letters were called out to him. (Tr. 199). While Plaintiff claimed he could not count or "identify basic . . . coins" with Dr. Murphy (Tr. 201), he "knew the number of pennies in a nickel, the number of nickels in a quarter and the number of quarters in a dollar" when examined by Dr. Culver (Tr. 245). Plaintiff also told Culver he did not need help to dress or bathe and maintained his own personal hygiene. (Tr. 245). Plaintiff inconsistently told the Administration that he requires his wife's assistance to dress, bathe and shave. (Tr. 163).

Culver diagnosed Plaintiff with mild mental retardation (Tr. 246), while both Murphy and Durbin felt he operated at a cognitive level of borderline, if not higher (Tr. 203, 213, 233). The ALJ adopted the borderline IQ assessments of Drs. Murphy and Durbin (Tr. 22), giving the most weight to the opinion of Dr. Durbin because she examined Plaintiff twice and her opinion was supported by "the claimant's work history and his estimated cognitive functioning" (Tr. 24).

As with any medical evidence, the ALJ "may make factual determinations on the validity of I.Q. tests" and may reject scores that are inconsistent with the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).  Contrary to Plaintiff's argument, the ALJ appropriately considered that Culver's findings were inconsistent with those of Durbin and Murphy and that he did not review Murphy's or Dubin's exams.  Plaintiff's contention that evidence of past malingering cannot be used to invalidate subsequent low IQ scores is without merit because the ALJ was obligated to consider Culver's IQ scores in connection with the entire record. *See Jones v. Barnhart*, No. 06-91, 2007 WL 628768, at *8-9 (W.D. Tex. Feb. 21, 2007) (substantial evidence supported rejection of low IQ scores thought reliable by examiner where scores were inconsistent with plaintiff's documented history of malingering on multiple intellectual tests).

Presented with the opinions of multiple examining physicians, the ALJ was free to choose the opinion(s) that were most supported by the record. *See Muse*, 925 F.2d at 790 (ALJ may "choose whichever physician's diagnosis is most supported by the record"); *see also Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989) ("factual determinations about the validity" of IQ scores are for the ALJ to determine).  As such, substantial evidence supports the ALJ's rejection of Culver's IQ scores.

Beyond rejecting Culver's diagnosis, the ALJ also found Plaintiff did not meet Listing 12.05C because his daily activities, behavior and employment history did not support deficits in either cognitive or adaptive functioning consistent with mental retardation — i.e., Listing 12.05. (Tr. 22).  Instead, the ALJ held Plaintiff's

14

functioning established that his "true cognitive ability was in the borderline range". (Tr. 22). The ALJ reviewed the entire record and specifically noted Plaintiff had past relevant work, could drive with a valid license and could read and write better than alleged. (Tr. 37-38, 155) (evidence of past relevant work); (Tr. 37, 39, 148, 243) (ability to drive); (Tr. 135, 142, 199, 243) (reading level).

Plaintiff argues his work history, ability to drive and reading level cannot support the ALJ's rejection of Culver's IQ scores or step 3 finding. The Commissioner responds that this evidence relevantly "demonstrates that Plaintiff possessed daily living skills and personal independence consistent with intact adaptive functioning." (R. Doc. 15 at 8). The Court agrees with the Commissioner.

Plaintiff previously worked as a driver for Healthy Choices transporting patients from their homes to appointments. (Tr. 37). He gave multiple inconsistent reasons for leaving this job after 6 months. (Tr. 37, 43, 232). He first testified that he quit due to back pain and seizures (Tr. 37, 232). But Plaintiff later explained: "Mostly, the reason why I stopped because he was, he was holding my check like for a whole month or so or either three weeks and we was getting paid after two weeks." (Tr. 43). Plaintiff also stacked lumber at a lumber yard, but testified that he left because of back pain and seizures. (Tr. 38). He also took a job frying chicken at Popeye's. (Tr. 38). However, Plaintiff quit after three days because of: "The heat, that's the only reason why I quit because of the heat" in the kitchen, which allegedly aggravates his seizures. (Tr. 43). Plaintiff also told Dr. Durbin that he tried running his own business, a barroom, but it closed down due to financial

reasons. (Tr. 213, 232). Importantly, Plaintiff never indicated that he quit any of these jobs or could no longer work because of mental retardation, including intellectual or adaptive deficits. (Tr. 42) (Plaintiff testified he cannot work "[b]ecause of my nerves and the way I, you know, I get nervous and shaky and uncomfortable."); (Tr. 213) (Plaintiff told Dr. Durbin he cannot work due to back pain); (Tr. 145-46) (Plaintiff's wife states he cannot work because of his back).

Plaintiff drives frequently and maintains a valid driver's license (Tr. 37, 39, 148, 207, 212, 232, 243). *See Cheatum v. Astrue*, 388 F. Appx. 574, 576-77 (8th Cir. 2010) (activities of daily living, which included light chores and driving a car did not support deficits in adaptive functioning consistent with mental retardation); *Harris v. Comm'r of Soc. Sec.*, 330 F. Appx. 813, 816 (11th Cir. 2009) (daily activities, including ability to drive inconsistent with alleged mental retardation); *Norwood v. Astrue*, No. 12-66, 2013 WL 959937, at *6 (S.D. Miss. Feb. 22, 2013) (claimant did not demonstrate deficits in adaptive functioning to meet Listing 12.05 where evidence showed she performs light chores, "drives locally, attends church, and interacts with family").

The ALJ also questioned Plaintiff's ability to read, which he described to her as "zero." (Tr. 45). "When interviewed for his disability claim by an SSA representative, the representative perceived no difficulties with the claimant's ability to read, understand or concentrate." (Tr. 135, 142). Plaintiff argues this "cannot be accepted as undermining" Culver's diagnosis because the interview occurred "*over the phone*." (R. Doc. 13 at 17). Even accepting this contention,

Plaintiff's argument is still not persuasive; it ignores substantial record evidence that Plaintiff over exaggerated his reading ability.  For example, Plaintiff began his examination with Dr. Murphy by stating he could not write his name or sign any of Murphy's consent forms. (Tr. 199).   After Murphy questioned this allegation — because Murphy was in possession of other SSA forms previously signed by Plaintiff — Plaintiff first claimed that his sister signed his name on his behalf, but later "changed his mind saying that she simply 'helped him.'" (Tr. 199).  Plaintiff's sister, who accompanied him to the exam, "seemed taken aback" when told Plaintiff alleged he could not write his name.  After "chang[ing] her story" a few times, she told Murphy that "she has to tell him the letters of his name so that he can write them." (Tr. 199).   Nonetheless, Plaintiff "said he still could not write his name" when Murphy later asked him to and "called out the letters" for him.  (Tr. 199). Claimant inconsistently told Dr. Culver that he "knows the letters of the alphabet" and during the evaluation he signed his name without objection and read "a few of the shorter words" on the consent form. (Tr. 243).   Moreover, Plaintiff indicated on his Disability Report that he can "read and understand English" and "can write more than [his] name in English." (Tr. 135).  Plaintiff also attended school, where he took special education classes, until quitting in the 12th grade. (Tr. 38, 46).  When ask why he did not complete the 12th grade Plaintiff explained that he quit after learning he would receive a certificate instead of a diploma and felt it would not help him obtain employment. (Tr. 39).

The ALJ correctly considered Plaintiff's daily activities, level of functioning and past employment to assess his intellectual and adaptive functioning. Having considered the entire record, the Court finds evidence substantially supports the ALJ's findings at step 3. *See McGee v. Astrue*, 291 F. Appx. 783, 787 (8th Cir. 2008) ("[T]he ALJ should examine the record to determine whether the proffered IQ score is reliable — that is, consistent with the claimant's daily activities and behavior.").

Finally, Plaintiff argues the ALJ's rejection of Culver's opinion is not supported by substantial evidence because as a child Plaintiff's "IQ scores were within the mild mentally retarded range" and mental retardation is a *"lifelong* condition." (R. Doc. 13 at 18).[3]  While IQ scores may stabilize during a lifetime, this stabilization does not tend to occur until "the age of 16." 20 C.F.R. pt. 404, subpt. P, app'x 1, § 112.00D(10).   And so, scores obtained between ages 7 and 16 are considered accurate and current for two to four years. 20 C.F.R. pt. 404, subpt. P, app'x 1, § 112.00D(10).  This is also consistent with guidance from the American Psychiatric Association. *See* American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) (Michael B. First, M.D., et al. eds., 4th ed. 2000).   The DSM-IV explains that "Mental Retardation is not necessarily a lifelong disorder" and individuals "who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks" can later on achieve improvement in adaptive functioning and "no longer have the level of impairment required for a diagnosis of Mental Retardation." DSM-IV at 47.

---

[3] Plaintiff cites to Listing "12.00B4" for this proposition.  The current text of Listing 12.00, however, contains no such provision.

Although Plaintiff's exact age when his childhood scores were obtained is unclear, he explained that he received benefits from 1988 until age 16, based on those scores. (Tr. 167). Therefore, his childhood scores are not indicative of his current level of intellectual or adaptive functioning.

As such, the ALJ's decision that Plaintiff functions at a level of borderline intelligence and does not meet Listing 12.05C is supported by substantial evidence. *See Hamilton v. Shalala*, 39 F.3d 319, at *2 (5th Cir. 1994) (unpublished table decision) (claimant did not meet Listing 12.05C because substantial evidence supported ALJ's finding "that Hamilton did not have a valid verbal, performance, or full scale IQ of 60 through 70").

### B.    Plaintiff Does Not Medically Equal Listing 12.05C

Plaintiff suggests the ALJ was required to, but failed to consider whether he medically equaled Listing 12.05C with a borderline IQ. (R. Doc. 13 at 21-22). Plaintiff also contends the ALJ "played doctor" by finding he did not satisfy Listing 12.05C. According to Plaintiff, a medical expert and not the ALJ should consider medical equivalence. Plaintiff suggests the failure to obtain an expert opinion on medical equivalence constitutes reversible error. (R. Doc. 13 at 22).

First, for "cases at the administrative law judge . . . level, the responsibility for deciding medical equivalence rests with the administrative law judge." 20 C.F.R. § 416.926(e). An ALJ's decision on medical equivalence should consider the entire record and any opinion given by a "medical or psychological consultant designated by the Commissioner." 20 C.F.R. § 416.926(c). General "policy requires that the

judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight" by the ALJ. SSR 96-6P, 1996 WL 374180, at *3 (July 2, 1996). This requirement may be satisfied if the record contains the "signature of a State agency medical or psychological consultant on" (1) a Disability Determination and Transmittal Form, (2) a Cessation or Continuance of Disability or Blindness Form, (3) a Psychiatric Review Technique Form, or (4) "various other documents on which . . . consultants may record their findings." SSR 96-6P, 1996 WL 374180, at *3. These documents satisfy the ALJ's "requirement to receive expert opinion evidence" before denying medical equivalence because they ensure that "consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels." SSR 96-6P, 1996 WL 374180, at *3. It is only when the ALJ receives additional evidence — not considered by the state agency consultant — that might change the consultant's findings that he or she "must obtain an updated medical opinion from a medical expert." SSR 96-6P, 1996 WL 374180, at *3-4.

Plaintiff suggests that the ALJ did not fulfill this obligation before deciding medical equivalence because Dr. Pamela Martin, the state agency psychologist, did not consider whether his impairments medically equaled Listing 12.05C on the Disability Determination and Transmittal Form. (R. Doc. 13 at 21-22). This argument is not persuasive. Dr. Martin reviewed the record, except for Dr. Culver's later obtained report, and found Plaintiff did not suffer from any severe mental

impairment, in particular an intellectual disability (Tr. 58), because of his "pattern of validated malingering" (Tr. 235). Because Plaintiff's behavior yielded "invalid" test scores, Martin determined the medical evidence of record did not establish a medically determinable mental impairment. (Tr. 58). Martin considered the severity of Plaintiff's alleged mental retardation and her signature on the form constitutes "record opinion evidence" of medical equivalence. *Cf. Brown v. Astrue*, No. 08-135, 2010 WL 4537019, at *7 (S.D. Miss. Oct. 8, 2010) (state agency psychologist's PRT form did not constitute record opinion evidence where it was unclear whether psychologist "submitted an expert opinion on the impairment at issue"); *Sowell v. Astrue*, No. 10-1835, 2011 WL 4348139, at *14 (E.D. La. Aug. 22, 2011) (obligation to obtain expert opinion on equivalence not satisfied where state agency consultant considered listings for mental impairments other than the impairment at issue).

The ALJ considered this evidence as required and assigned no weight to Martin's opinion. (Tr. 24). The ALJ was not obligated to obtain an updated opinion unless she believed Culver's medical report might change Dr. Martin's findings. Considering the ALJ rejected Dr. Culver's report, she had no duty to obtain an updated opinion from Martin. *See Moxley v. Astrue*, No. 08-731, 2919 WL 572102, at *7-8 (N.D. Tex. Feb. 10, 2010) (duty to obtain expert opinion on medical equivalence satisfied even though consultant's opinion only recognized some of the alleged impairments; despite new evidence, ALJ not required to obtain updated opinion

where record indicated ALJ felt claimant's impairments did not meet listing and new evidence would not change opinion of consultant).

Aside from failing to obtain an updated expert opinion, Plaintiff claims the ALJ's opinion is legally erroneous because she failed to assess whether he medically equaled Listing 12.05C with a borderline IQ. (R. Doc. 13 at 21-22).  The ALJ found "compelling evidence that the claimant's actual level of intellectual functioning is greater than the mild mentally retarded range and as such [Listing] 12.05 is not appropriate for assessment of the claimant's impairment." (Tr. 22).   Plaintiff contends this statement ignores the SSA's own policy and constitutes reversible error. (R. Doc. 13 at 21).   According to Plaintiff, SSA "policy is to find that a claimant medically equals Listing 12.05C if he has a slightly higher IQ between 70-75 (which is in the borderline range) and other physical or mental disorders that impose additional and significant work-related limitation of function." (R. Doc. 13 at 21).   The "policy" Plaintiff refers to is the Administration's POMS DI 24515.056(D)(1)(c). (R. Doc. 13 at 21). *See* Social Security Administration: Program Operations   Manual   System   (POMS),   Disability   Insurance   (DI)   No. 24515.056(D)(1)(c), *Evaluation of Specific Issue—Mental Disorders—Determining Medical Equivalence* (2012).

To begin, the Administration's Program Operations Manual System (POMS) is an internal agency manual.  Its guidance has no legal force and failure to follow the POMS is not legal error. *See Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989) ("Although the POMS is a policy and procedure manual

that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law, it is nevertheless persuasive."). Even assuming for argument's sake that the ALJ committed any error, Plaintiff has not demonstrated any resulting prejudice because substantial evidence supports the ALJ's step 3 finding. *See Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007) (an error at step 3 will not require reversal unless claimant shows it resulted in prejudice).

POMS DI 24515.056(D)(1)(c) explains that Listing 12.05C can be medically equaled with "slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination." Generally, "the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found." POMS DI 24515.056(D)(1)(c). "This evaluation tool, however, is used only when 'the capsule definition'" — i.e., the introductory paragraph — of Listing 12.05 is satisfied. *Crane v. Astrue*, 369 F. Appx. 915, 921 (10th Cir. 2010) (quoting POMS DI 24515.056(B)(1)). The introductory paragraph or "capsule definition" of Listing 12.05 requires a claimant to satisfy 3 criteria: (1) "significantly subaverage general intellectual functioning;" (2) "deficits in adaptive behavior;" and (3) "manifested deficits in adaptive behavior before age 22." *Randall*, 570 F.3d at 661.

Prior to providing a detailed discussion of the evidence, the ALJ explained that "the medical evidence does not document listing-level severity, and no

acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment," including Listing 12.05C. (Tr. 20). As previously discussed, the ALJ then gave 5 specific reasons for why Plaintiff's functional deficits did not satisfy the criteria of Listing 12.05C. These reasons, along with the medical evidence of record indicate Plaintiff has neither the level of sub-average intelligence nor the level of deficits in adaptive functioning required to satisfy the capsule definition of Listing 12.05. *Crane*, 369 F. Appx. at 921 (POMS evaluation for 12.05C not applicable where claimant could not produce evidence that she met introductory paragraph of Listing 12.05). As such, Plaintiff has not shown that he medically equals Listing 12.05C.

### C. Substantial Evidence Supports the RFC and Step Five Findings

Plaintiff offers three arguments in support of his contention that the ALJ's RFC and step 5 findings are not supported by substantial evidence. (R. Doc. 13 at 23-25). In Plaintiff's words: (1) "The ALJ's RFC finding includes the limitation of 'work that is . . . supervised,' but does not specify the degree of supervision required;" (2) "[T]he RFC does not include limitations the ALJ found Cornish has;" and (3) "[T]he ALJ's decision does not mention—nor contain an explanation of the weight the ALJ accorded to—limitations opined by Dr. Murphy and Dr. Culver." (R. Doc. 13 at 23). The Court disagrees with Plaintiff.

Case 3:13-cv-00002-BAJ-RLB   Document 16   03/31/14   Page 25 of 28


First, any error resulting from the ALJ's failure to specify the degree of supervision in the RFC is harmless because this exact issue was clarified by the vocational expert during the hearing. (Tr. 49-50). The first hypothetical posed by the ALJ included Plaintiff's need for a "job with regular supervision." (Tr. 49). The ALJ explained she did not "know if regular is the right word to use" but she meant "he would need to be supervised." (Tr. 49). The VE understood and responded that Plaintiff could work in "janitorial positions," "laundry worker positions" or as a "lobby cleaner" within the parameters of that hypothetical. (Tr. 49). The ALJ then asked what jobs would be available if she changed the degree of supervision to "constant supportive supervision." (Tr. 50). In those circumstances, the VE explained Plaintiff could not "work in competitive employment." (Tr. 50). In her decision, the ALJ found Plaintiff could perform other work in the national economy based on his RFC, which is identical to the ALJ's first hypothetical question to the vocational expert. Those jobs included janitorial worker, laundry worker and lobby cleaner. (Tr. 26). As such, the record clarifies and supports the degree of supervision — regular, as described in the ALJ's first hypothetical. (Tr. 49). *See, e.g., Masterson v. Barnhart*, 309 F.3d 267, 273-74 (5th Cir. 2002) (substantial evidence supported ALJ's decision where VE hypotheticals incorporated all impairments recognized by ALJ).

Beyond that, the Commissioner points out that Plaintiff's attorney had an opportunity to question the VE and made no effort to "further develop" the issue of supervision or clear up any confusion resulting from the ALJ's hypothetical.

*Bowling v. Shalala*, 36 F.3d 431, 435-36 (5th Cir. 1994) (substantial evidence supported ALJ's step 5 finding that relied on VE testimony where hypotheticals included all recognized limitations and claimant's attorney was given an opportunity to cross examine the VE). As such, the degree of supervision referenced in the RFC is sufficiently clear to render the RFC supported by substantial evidence.

Next, Plaintiff suggests the RFC is not supported by substantial evidence because the ALJ assessed "mild difficulties" in social functioning, but failed to incorporate this limitation into the RFC. (R. Doc. 13 at 23). Because Plaintiff alleged a mental impairment, the Regulations required the ALJ to use a special technique to assess severity at steps 2 and 3. 20 C.F.R. § 416.920a (evaluation of mental impairments at steps 2 and 3). The technique rates the degree of "functional limitation" — none, mild, moderate, marked or extreme — in four "functional areas" contained in Listing 12.00B and C — social functioning; activities of daily living; concentration, persistence and pace; and episodes of decomposition. 20 C.F.R. § 416.920a(c)(3)-(4). "The limitations identified" in these functional areas (or paragraph B and paragraph C criteria) "are not an RFC assessment but are used to rate" severity at "steps 2 and 3 . . . . The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).

To determine RFC, the ALJ must consider the combined effects of all severe and non-severe impairments. *See* 20 C.F.R. § 416.945(a)(2). Nonetheless, because

26

the RFC evaluation requires a more detailed assessment, the ALJ cannot rely on the step 2 or 3 findings and must make "a mental RFC assessment separate from the non-severity determination made at step two." *Suttles v. Colvin*, – F. Appx. – , 2013 WL 5832529, at *2 (10th Cir. 2013) ("mental limitations noted in the threshold inquiry at steps two and three do not apply at later steps").  The ultimate question is whether the ALJ "considered the impairment at the RFC stage" and whether the RFC is supported by substantial evidence. *Id.* at *2.

At the RFC stage, the ALJ fully discussed the record and all of Plaintiff's limitations resulting from his impairments, both severe and non-severe, including Plaintiff's level of social functioning. (Tr. 23-25).  The RFC does not account for any deficits in adaptive function and Plaintiff has not made an adequately developed argument concerning this issue or pointed to anything that would call the RFC into question.  Even still, the decision and record indicate the omission of limitations in social functioning is supported by substantial evidence.

Dr. Durbin, whose opinion the ALJ adopted, found Plaintiff's "ability to relate to others, including supervisors and co-workers, is adequate" (Tr. 214) and "not significantly impaired" (Tr. 233).  Plaintiff also reported to Dr. Culver that he gets along well with others and does not get into fights. (Tr. 244-45). There is also no evidence that Plaintiff had trouble interacting with co-workers or supervisors during his past employment.  And so, substantial evidence supports the lack of limitations in social functioning in the RFC assessment.

Finally, Plaintiff suggests the ALJ's RFC and step 5 findings are not supported by substantial evidence because neither incorporate limitations assessed by Drs. Murphy and Culver. This argument is without merit. The ALJ fully discussed the opinion of all three examining psychologists, Drs. Durbin, Murphy and Culver (Tr. 23), and the opinion of the state agency psychologist, Dr. Martin (Tr. 24). The ALJ explained in detail that she rejected the Dr. Martin's (Tr. 24) opinion and Dr. Culver's opinion (Tr. 22, 23) because they were inconsistent with the record and agreed with Dr. Murphy's overall assessment of borderline intelligence (Tr. 22-23). The ALJ then adopted the opinion of Dr. Durbin because it was consistent with the record and Durbin was the only doctor to examine Plaintiff on more than one occasion (Tr. 24-25). As previously discussed, substantial evidence supports the weight given to the various psychologists. *See supra* Part V.A (Plaintiff does not meet Listing 12.05C). The ALJ appropriately excluded the findings of medical opinions she either rejected or did not adopt into the RFC.

## VI.   CONCLUSION

For the reasons given above, **IT IS ORDERED** that the decision of the Commissioner is **AFFIRMED** and Plaintiff's appeal **DISMISSED with prejudice**.

Baton Rouge, Louisiana, this 31st day of March, 2014.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

28